**DUNN & BLACK, P.S., Plaintiff,**

v.

**THE UNITED STATES of America; and Environmental Reclamation, Inc., an Idaho corporation; and John Doe Corporations 1–10, Defendants.**

**Fidelity and Deposit Company of Maryland, a Maryland corporation, and American Guaranty & Liability Insurance Company, a New York corporation, Intervenors.**

No. CV–04–0229–LRS.

United States District Court,
E.D. Washington.

Feb. 25, 2005.

Richard Duncan Campbell, Robert A. Dunn, Dunn & Black PS, Spokane, WA, for Plaintiff.

Jennifer D. Auchterlonie, U.S. Department of Justice Tax Division, Washington, DC, for Defendants.

Gerri Sirek, Gerri Sirek Law Office, Spokane, WA, Michelle R. Points, Hawley Troxell Ennis & Hawley, Boise, ID, for Intervenors.

## ORDER

SUKO, District Judge.

BEFORE THE COURT is Intervenors' Fidelity and Deposit Company of Maryland and American Guaranty & Liability Insurance Company's [Intervenors[1]] Motion for Declaratory Judgment, filed October 19, 2004 (Ct.Rec.20); Plaintiff Dunn and Black, P.S.'s [law firm] Motion for Summary Judgment (Ct.Rec.28), filed November 2, 2004; and Intervenors' Alternative Motion For Stay of Plaintiff's Motion For Summary Judgment under Fed. R.Civ.P. 56(f) (Ct.Rec.40), filed November 16, 2004. These motions were heard with oral argument on December 20, 2004, at which time the court requested supplemental briefing on jurisdiction and lien priority issues.

## I. BACKGROUND FACTS AND SUMMARY OF THE PARTIES' ARGUMENTS

On June 20, 2004, plaintiff law firm, Dunn & Black, brought a complaint in this court for declaratory judgment against the United States and plaintiff's former client Environmental Reclamation, Inc. [ERI][2], the non-participating defendant construction company. Plaintiff requested this court to declare that its fees and costs of $361,037.20 are reasonable for the legal services rendered and that it was entitled to assert an attorney's fee lien. First Amended Complaint, Prayer for Relief. Further plaintiff requested that the court declare its attorney's fee lien superior to all subsequent liens, claims, interest in and

to the judgment in the matter of *Environmental Reclamation, Inc. v. United States*, case number 02–5C, before the U.S. Court of Federal Claims [Court of Claims litigation]. Id. Alternatively, plaintiff requested that this court declare that the United States' setoff constitutes unjust enrichment without fairly compensating Dunn & Black for its services in creating the judgment fund, which reasonable amount is $361,037.20. Id. Additionally, plaintiff requested this court declare that the United States' setoff would be a violation of due process and plaintiff be paid $361,037.20.

On September 16, 2004, the court allowed intervenors, judgment creditors of ERI, to intervene. Ct. Rec. 19.

The matter before the court on cross motions for declaratory judgment and summary judgment began as a contest of liens: an attorneys' lien for services rendered in winning the disputed settlement/judgment fund[3] against the government versus liens by the intervenors versus IRS liens on the judgment fund based on taxes owed by the law firm's former client ERI. There are combinations of four distinct theories set forth by the parties for this court to consider in its determination of the destiny of the Judgment Fund: lien priority, equitable subrogation, equity, and set-off.

On July 24, 1997, ERI executed an Indemnity Agreement agreeing to indemnify, save, and hold harmless the intervenors as sureties for its execution or procurement

---

1. Zurich American Insurance Company "Zurich" is the sole shareholder of American Guarantee & Liability Corporation "AGLIC" and Fidelity & Deposit Company of Maryland "F & D," and are collectively called intervenors.

2. ERI has been out of business for several years and did not participate in the proceed-

ings before the court. Apparently ERI is judgment proof and insolvent, although no bankruptcy has been filed. Aff. of R. Campbell, ¶ 13.

3. The judgment fund of $450,000 is being held by the Department of Treasury presently.

of bonds or undertakings on behalf of ERI as the principal. Ferguson Aff., ¶ 4.

On September 29, 1998, ERI executed a second Indemnity Agreement agreeing to indemnify, save, and hold harmless the intervenors as sureties for its execution or procurement of bonds or undertakings on behalf of ERI as the principal. Ferguson Aff., ¶ 5.

On March 11, 1999, ERI and Flying Eagle Corporation executed an Application for Performance and Payment Bond and Indemnity Agreement with the intervenors as the surety. Ferguson Aff., ¶ 8. Flying Eagle Corporation (a dissolved corporation) and ERI jointly, severally, and unconditionally agreed to indemnify and reimburse intervenors for said Payment and Performance Bond and reimburse intervenors for and against any loss in connection with said Bond. Id.

On July 8, 1999, the Western Federal Lands Highway Division of the Federal Highway Administration [FHWA] awarded a contract to ERI in the amount of $3,499,464.50. Points Aff., Exh. D. The overall purpose of the contract was to rebuild Forest Development Road # 340 in the Payette National Forest near Warren, Idaho. Id. The project involved rebuilding four bridges, pioneering a new alignment for the road across a steep hillside, and other miscellaneous work. Id. ERI began work on July 22, 1999. Id. ERI's original completion date was October 12, 2000. Id. This date was later extended to July 9, 2001. Id.

On August 18, 1999, ERI executed a third Indemnity Agreement agreeing to indemnify, save, and hold harmless the intervenors as surety for its execution or procurement of bonds or undertakings on behalf of ERI as the principal. Ferguson Aff., ¶ 6.

In the year 2000, ERI retained the plaintiff law firm to advise it regarding a road project called the Warren Profile Gap Road Project [Warren Project] in South Central Idaho for FHWA. Plaintiffs' SOF,[4] ¶ 1. The government was refusing to grant extensions of time and increases to ERI's contract amount. Id. At the time ERI engaged Dunn & Black to advise it on the Warren Project, Dunn & Black had an ongoing client relationship with ERI and was representing ERI on several other matters at an hourly rate. Id., ¶ 2.

On January 4, 2001, the contracting officer for the government issued a termination for default to ERI for the Warren Project. Points Aff., Exh. D. According to Dunn & Black, the alleged wrongful termination of ERI by the government caused tremendous financial stress on ERI, including ERI's inability to pay taxes. Plaintiffs' SOF, ¶ 5.

On January 3, 2002, plaintiff filed an action in the United States Federal Court of Claims on behalf of ERI to recover monetary damages for alleged wrongful termination in the amount of $1,724,295.98 against the FHWA, a U.S. Department of Transportation organization. [Court of Claims litigation]. Plaintiffs' SOF, ¶ 3, Aff. of M. Points, Exh. D. In the Court of Claims litigation, ERI also requested that the termination for default be converted into a termination for convenience. Id.

The Court of Claims litigation presented complex issues involving scheduling, accounting, rock geology and blasting. Plaintiffs' SOF, ¶ 3. The United States asserted a claim for reprocurement costs in the amount of $948,168.82. Id. Dunn & Black engaged and paid experts to assist in proving ERI's case and defending the government's claim. Id.

---

4. SOF designates "Statement of Uncontro- verted Facts."

On November 20, 2002, Dunn & Black amended its existing hourly fee agreement it had with ERI, negotiated[5] and entered into a contingency fee agreement due to the high balance of accounts receivable carried on the Warren Project and other matters. Plaintiffs' SOF, ¶ 4. At this time, ERI was indebted to Dunn & Black in the amount of $137,682.33 for past due legal services rendered on the Warren Project as well as on other matters. Id. The contingency fee agreement stated that Dunn & Black "shall be entitled to the first $137,682.33 of any recovery from any claims related to the project." Id. The agreement further stated that "Dunn & Black shall be compensated for its further services relating to the [Warren] Project in the amount of 50% of any remaining recovery and that ERI was responsible for all litigation costs." Id.

On November 14, 2003, Fidelity & Deposit Company of Maryland [F & D], et al. (intervenors in this action) brought an action against ERI in the United States District Court, District of Idaho, Civ. No. 03–497–EJL, to recover for the amount paid out against the ERI bonds and related collection expenses, including Bond # SUR–3596528 for the Warren Project. F & D filed a motion for summary judgment for the cumulative total of $931,860.84 claimed to be owed by ERI to F & D. (Ct.Rec.14, Civ. No. 03–497–EJL). ERI did not respond to the dispositive motion. On July 29, 2004, Judge Edward Lodge entered judgment in favor of the surety companies (intervenors in this action) against ERI for $931,860. (Ct. Rec.22, Civ. No. 03–497–EJL).

On March 30, 2004, a "Stipulation For Entry of Judgment" was entered in the Court of Claims litigation. Points Aff., Exh. D. The stipulation was entered to settle the claims asserted in ERI's complaint and to permit entry of final judgment upon those claims without constituting an admission of liability upon the part of the government. Id. ERI offered to settle all of its claims in exchange for payment by the United States of $450,000 (inclusive of interest, costs, expenses, and attorney fees) and the government's agreement to convert the termination for default into a termination for the convenience of the Government. Id.

Subsequent to that stipulation, a $450,000 judgment was entered against the United States on April 5, 2004[6] [hereinafter referred to as the judgment fund]. Id. This $450,000 judgment fund lies at the vortex of this litigation.

According to Dunn & Black, ERI was required to pay the law firm $361,037.20 from the judgment fund pursuant to the contingency fee agreement. Plaintiff's SOF, ¶ 6.

The Internal Revenue Service [IRS], upon learning of the settlement, asked the government to stop payment of the judgment so that the IRS could offset certain federal tax liabilities of ERI against the judgment.

On May 5, 2004, plaintiff was informed by a government attorney that the IRS

---

5. The terms of the contingency fee agreement were negotiated between Dunn & Black and the ERI president at that time, Donald Tulloch. Id. In an affidavit filed by Mr. Tulloch on December 28, 2004 (Ct.Rec.54), apparently on his own behalf, he states that he was forced to resign in early January of 2003 and questions the reasonableness of the settlement between ERI and the government in the Court of Claims litigation and the authority Dunn and Black had to settle.

6. In what appears to be merely a typographical error, the United States incorrectly refers to the $450,000 judgment date throughout its briefing being entered on April 15, 2004, rather than April 5, 2004. Ct. Rec. 33, page 2.

would be making claims to the settlement funds as an intended offset of the entire amount of the judgment based on an unrelated federal tax debt purportedly owed by ERI[7]. Plaintiffs' SOF, ¶ 7. In its answer to the plaintiff's complaint in the instant action, the government (IRS) claims to be owed $987,839.84 as of April 30, 2004.

Answer, ¶ 20.[8]

The Treasury Department is now withholding the judgment fund based on the following tax liens that the IRS filed against ERI:

| | |
|---|---|
| August 29, 2003 | $ 3,969.36 |
| November 19, 2003 | $ 64,178.03 |
| March 29, 2004 | $419,573.16 |
| April 7, 2004 | $412,148.54 |
| | $899,869.09 |

Points Affidavit, ¶ 4.

On May 5, 2004, plaintiff, after being informed that the IRS would be making claims, served the government with a Notice of Attorney's Lien. Plaintiffs' SOF, ¶ 8. On May 7, 2004, ERI terminated its attorney-client relationship with plaintiff law firm. ERI has not paid any of the amounts owing to plaintiff. Id., ¶ 13.

On June 3, 2004, the government filed a civil action in the United States District Court for the District of Idaho (Case No. 2:04–cv–279–EJL) to reduce ERI's federal tax assessments to judgment. Ct. Rec. 1, Case No. 2:04–cv–279–EJL. Originally the government demanded $988,000 in unpaid tax assessments. Id. On September 2, 2004 the government amended its complaint, demanding only $567,304.85 for unpaid federal employment and unemployment tax liabilities plus interest and other statutory additions. Ct. Rec. 6, Case No. 2:04–cv–279–EJL.

On November 29, 2004, the Idaho district court entered judgment in the amount of $609,079.96 (with statutory additions and interest) upon the government's motion for default judgment against ERI. Ct. Rec. 15, Case No. 2:04–cv–279–EJL; Auchterlonie Decl., Exh. 1.

Intervenors state that ERI owes them $931,930.61 plus interest accruing for all projects having the same principal (ERI) and the same obligee/owner (the United States), and which amount has been reduced to a judgment rendered in civil action, Civ. No. 03–497–EJL.

**Bonds, Bond Payments, Related Bond Expenses**

ERI entered into the following bonds as principal in which the intervenors are sureties:

| | | | |
|---|---|---|---|
| SUR–2887088 | Rio Pojaaque | 11/20/98 | $2,483,840.59 |
| SUR–2887092 | DEQ Worland | 02/24/99 | $1,779,219.53 |
| SUR–2887095 | DOR Worland | 04/20/99 | $71,168.78 |
| SUR–3596528 | Warren Project | 07/12/99 | $1,272,785.80 |

7. According to Dunn & Black, at the time the Court of Claims litigation was filed, there were no outstanding tax liens. Plaintiffs' SOF, ¶ 10. At the time of the written contingency fee agreement between Dunn & Black and ERI (November 20, 2002), the taxes owed by ERI were $40,683.93, based on a tax lien assessed on September 2, 2002. Id., ¶ 10.

8. Dunn & Black disagrees with this amount, stating that tax records from the state of Idaho show a total of $480,295.93 outstanding, which includes the $40,683.93 assessed on September 2, 2002. Id., ¶ 11. intervenors, however, are in agreement with the United States tax lien figures. Ct. Rec. 21, page 4. The court attempted to verify these assessment dates from the Auchterlonie Decl., Ct. Rec. 57, filed after the hearing on January 3, 2005, but was unable to do so based on copy quality, dates cut off of the right margin and unfamiliarity with the forms.

| SUR–3596532 | Burgdorf Bridge | 09/17/99 | $29,150 |
| SUR–3596536 | Barrick Mine | 06/01/00 | $800,000 [9] |
| SUR–3631158 | Barrick Goldstrike | 06/27/00 | $60,000 |
| SUR–3631159 | Goat Creek | 07/13/00 | $633,595 |

Ferguson Aff., ¶¶ 9–17 [hereinafter collectively referred to as "Issued Bonds"].

Intervenors state they have made payments of $1,467,455.03 pursuant to the terms of the Issued Bonds and have incurred expenses of not less than $122,800 associated with the collection of all unpaid balances owed to intervenors by ERI. Ferguson Aff., ¶¶ 18, 19.

Intervenors' payments of amounts owing to ERI's material suppliers and subcontractors used and any expense payments made to legal and engineering firms on various bond projects with ERI are as follows:

| Bond Number | Payee | Date Paid | Amount |
| --- | --- | --- | --- |
| SUR–2887088 | J.R. Striping | 2/21/01 | $ 2,571.76 |
| | Valley Fence | 2/15/01 | $ 17,989 |
| | Montoya Constr. | 6/22/01 | $ 17,085.38 |
| | | | $ 37,646.31 |
| SUR–2887092 | | | |
| SUR–2887095 | Product Level | 3/8/01 | $ 95,534.55 |
| | Martin Constr. | 4/10/01 | $ 27,500 |
| | R.H. Grover | 10/4/02 | $ 212,079.74 |
| | Wyoming State | 11/6/02 | $ 71,168.78 |
| | | | $ 406,283.07 |
| | Legal Expense | various | $ 71,374.69 |
| | Travel Expenses | | $ 2,045.68 |
| | | | $ 73,420.44 |
| SUR–3596528 [10] | | | |
| SUR–3596527 [11] | MSE–HKM, Inc. | 2/15/01 | $ 12,053.93 |
| | Neff Rental | 2/15/01 | $ 57,611.55 |
| | Materials Testing | 2/15/01 | $ 26,687.00 |
| | Precision Sawdust | 2/16/01 | $ 1,100.00 |
| | Heavy Equipment | 5/4/01 | $ 12,826.13 |
| | Quattro Envir. | 5/4/01 | $ 5,616.62 |
| | ICM/Great Northern | 5/15/01 | $ 6,510.00 |
| | | | $ 122,405.23 |
| | Law Firm/Travel | Various | $ 97,876.08 |

9. The original amount of this bond, originally issued January 25, 2000 was $250,000, which was ultimately changed to $800,000 on June 1, 2000.

10. This bond is the Warren Profile Gap Project.

11. This bond was also apparently issued in connection with the Warren Profile Gap Project. However, this bond was not originally mentioned in intervenors' Memo in Support of Declaratory Judgment (Ct. Rec. 21, page 4).

| | | | |
|---|---|---|---|
| SUR–3596532 | Crane West | 5/28/02 | $ 10,125.00 |
| SUR–3596536 | Komatso Equip. | * * | $ 800,000 |
| SUR–3631158 | Familliam NW | 2/9/01 | $ 58,903.76 |
| SUR–3631159 | ICM/Great Northern | 5/1/01 | $ 21,420.00 |
| SUR–3631157 [12] | ICM/Great Northern | 5/1/01 | $ 4,758.00 |
| SUR–3596534 [13] | Missouri Dept. Rev. | 6/11/03 | $ 3,835.79 |
| SUR–2887086 [14] | Star Rentals | 9/3/03 | $ 2,166.45 |
| Grand Total | | | $1,638,840.06 |

As a result of the government's issuance of termination for default [15] on January 4, 2001 with respect to the Warren Project, from Feb 15, 2001 through May 15, 2001, intervenors incurred losses totaling $220,281.31 under bond numbers SUR–3596528 and SUR–3596527. ˙ (Suppl. Ferguson Aff., Exh. A).

As a result of ERI's financial difficulties encountered on the Warren Project, ERI evidently defaulted in its contractual obligation to pay its subcontractors and material suppliers on other projects as well. Intervenors consequently received notices of claims against the payment bonds. After investigating and verifying the validity of the claims, intervenors satisfied the obligations of its payment bonds by paying the claims of the subcontractors, laborers and material suppliers and legal/engineering expenses between February 2, 2001 and April 21, 2004 in sums totaling $1,638,840.06 under its bond numbers set forth in the Supplemental Ferguson Affidavit, Exh. A.

Intervenors further provide dates in which they perfected a security interest in ERI's contract rights prior to the date that plaintiff's attorney lien first arose, giving intervenors a priority right to the Judgment fund:

| | |
|---|---|
| 07/24/97 | ERI granted a security interest to intervenors in all rights under the contracts mentioned in the Bonds. [July 1997 Security Agreement] |
| 03/02/01 | A UCC–1 Financing Statement filed with Idaho Sec. Of State's Office, perfecting intervenors security interest in the Collateral. |
| 08/18/99 | ERI granted a security interest to intervenors in the Collateral to secure and hold harmless intervenors against any and all liabilities [August 1999 Security Agreement] |
| 03/06/01 | A UCC–1 Financing Statement filed with Idaho Sec. Of State's Office, perfecting intervenors security interest in the Collateral. |
| 09/29/98 | ERI granted a security interest to intervenors in the Collateral to secure and hold harmless intervenors against any and all liabilities [September 1998 Security Agreement] |
| 03/02/01 | A UCC–1 Financing Statement filed with Idaho Sec. Of State's Office, perfecting intervenors security interest in the Collateral. |

12. This bond, No. SUR 3631157, was apparently issued for ERI's Beartrack Reclamation Project. This bond was not mentioned until the Suppl. Ferguson Affidavit was filed in support of intervenors' Declaratory Judgment motion. It is not clear if this bond was one of the bonded multiple projects with the same obligee. It is clear from the supplemental affidavit that ERI is the principal.

13. See Footnote 12. It is unclear if this bond was one of the bonded multiple projects with the same obligee. It is clear from the supplemental affidavit that ERI is the principal.

14. See Footnote 12.

15. It is unknown what the amount of undisbursed contract balance otherwise payable to ERI, if any, was at the time of the government's termination on January 4, 2001.

Intervenors state that ERI was obligated to indemnify and hold intervenors harmless for any payments made by intervenors under the terms of the Issued Bonds, which were issued as a means of satisfying obligations owed by ERI to its creditors. Ferguson Aff., ¶¶ 20,22. Although intervenors have recovered the amount of $221,061.66 in retained contract funds in the Wyoming Department of Environmental Quality Worland Project (Bond No. SUR–2887092), intervenors state that the amount currently due intervenors by ERI (as of October 10, 2004) is $931,930.61, for all bond payments and expenses incurred by intervenors in connection with all bonds issued to ERI. Ferguson Aff., ¶¶ 21, 22.

### A. Intervenors' Theory For Recovery of $450,000

Intervenors are surety insurance companies. As a surety, intervenors issued several performance and payment bonds on behalf of its principal, a construction company, ERI. Intervenors assert that because all issued bonds were issued in favor of ERI by July of 2000 and ERI owes them more than $450,000, intervenors' claim to the entire Judgment Fund has priority over any claim of plaintiff or any claim of the United States under the law of equitable subrogation. Intervenors argue that the date of priority of their claim is based on the dates the bonds were issued. The bond for the Warren Project was issued on July 12, 1999. Further, relying on *Transamerica Ins. Co. v. U.S.*, 989 F.2d 1188 (Fed.Cir.1993), intervenors argue that when a surety has bonded multiple projects with the same principal and obligee, the surety may use the default on one project to trigger its equitable subrogation rights to undisbursed construction funds on other bonded projects. Because ERI owes intervenors $931,930.61 plus interest for all ERI bonded projects with the Unit-

ed States, the entire judgment amount of $450,000 should be awarded to intervenors under the law of equitable subrogation based on their dates of priority.

Intervenors further argue that they have a valid and prior perfected security interest in the judgment fund over any and all lien claimants or secured parties pursuant to Idaho Code § 28–9–308; § 28–9–322. Because Dunn & Black did not commence this suit until January 3, 2002, intervenors' security interest was perfected prior to the commencement and perfection of Dunn & Black's attorney fee lien.

In response to *United States v. Munsey Trust Co. of Wash. D.C.*, 332 U.S. 234, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947) case, raised by both plaintiff and the Unites States, intervenors reply that although the *Munsey Trust* case does establish that the government has a right to set off claims against creditors, "[t]he surety who undertakes to complete the project is entitled to the funds in the hands of the government not as a creditor and subject to setoff, but as a subrogee having the same rights to the funds as the creditor." *Trinity Universal Ins. Co. v. United States*, 382 F.2d 317 (5th Cir.1967).

Intervenors also point out that *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), cited by Plaintiff, reaffirmed that sureties who complete the performance of a contract or the sureties who pay laborers and materialmen have an equitable right of subrogation to all those who have a claim in the subject contract.

In conclusion, the intervenors' position that the entire judgment fund should go to Intervenors is based on these arguments: 1) the plain and unambiguous language of the indemnity agreements between ERI and Intervenors; 2) priority dating back to the issuance of bonds and U.C.C. filings;

3) the special treatment of sureties; and 4) the amount ERI owes intervenors.

## B. Plaintiff Law Firm's Theory For Recovery of $361,037.20

Dunn & Black argues that it is entitled to an adjudication of its fees and costs which should be granted as a matter of law over ERI in the amount of $361,037.20. The breakdown of that amount is as follows:

| | |
|---|---|
| $137,682.33 | ERI's debt pre-dating the Contingent Fee Agreement |
| $156,158.84 | Fee on Warren Project |
| $ 67,196.03 | Cost on the Warren Project matter |
| $361,037.20 | |

Plaintiff argues that at the moment it filed the lawsuit on ERI's behalf in the Court of Claims litigation on January 3, 2002, a lien for attorney's fees attached to the cause of action. Also, when that lawsuit was filed, the parties to the present lawsuit had notice of plaintiff's lien, which qualifies as constructive notice sufficient to impose an attorney's lien under Idaho law. At the time of the Court of Claims litigation, plaintiff states there were no outstanding IRS tax liens filed against ERI, as all tax liens were filed after January 2002. Therefore, plaintiff's lien for attorney fees attached and was choate prior to any federal tax lien. Plaintiff argues that choate state-created liens take priority over later-filed federal tax liens. The United States, plaintiff asserts, is not entitled to offset the entire amount of the judgment because Dunn & Black has a vested property interest in the judgment, under *Banaitis v. IRS*, 340 F.3d 1074 (9th Cir.2003).[16]

Plaintiff further argues that the United States is precluded from offsetting plaintiff's fee because there is no mutuality of debt. Mutuality requires that the judgment creditor be the same person the party owes the debt to be collected, and the government must be the same person to whom the debt is owed. Plaintiff argues the United States cannot set off ERI's tax obligations against the amount of attorney's fees owed to plaintiff as no mutuality of debt exists between plaintiff and the United States.

Plaintiff asserts that the intervenors' judgment lien did not attach until July 29, 2004. Pursuant to the first in time rule, plaintiff's attorney's lien, which attached at the time it commenced the action on behalf of ERI on January 3, 2004, has priority over the intervenors' judgment lien.

Plaintiff additionally argues that public policy favors giving attorneys' contractual liens for legal services priority over judgment creditors' liens. Plaintiff cites *Pangborn v. Carruthers*, 97 Cal.App.4th 1039, 119 Cal.Rptr.2d 416 (2nd Dist.2002) and other cases to support its argument that the equities and public policy favor judgement to plaintiff law firm.

Through its efforts, plaintiff points out that the United States or the intervenors will still receive $88,962.80 ($450,000—$361,037.20) if plaintiff receives the requested $361,037.20 that they otherwise would have had to collect from ERI at its own expense. In light of ERI's financial troubles caused by the United States' alleged breach of contract, Dunn & Black contends neither the intervenors nor the United States would have collected anything at all from ERI without the efforts of plaintiff. Therefore, equity demands that plaintiff be compensated for its services, ahead of the United States and the

**16.** *Banaitis* examined the Oregon statute which governed attorney's fees. Plaintiff argues that the Idaho statute is similar to Oregon's in that it provides generous protections to attorneys in collecting their fees.

intervenors, because it was through plaintiff's efforts that such fund exists for anyone to vie for.

## C. United States' Theory For Setoff of $450,000

The United States argues, at the outset, that this court does not have jurisdiction to provide relief sought by intervenors in excess of $10,000. The United States asserts that the Federal Court of Claims has exclusive jurisdiction over claims against the government exceeding $10,000, regardless of whether the claimant is seeking declaratory judgment. The United States urges this court to dismiss the intervenors' claims.

In the event jurisdiction is proper before this court, the United States argues that as to intervenors, the doctrine of equitable subrogation provides that a surety who pays the debt of another is entitled to all the rights of the person it paid to enforce its right to be reimbursed. Therefore, any subrogation right claimed here by intervenors is dependent on who the intervenors paid and what rights that person(s) had. The United States argues intervenors have not provided this information and without it, the court cannot make any determination with respect to the validity or priority of any equitable subrogation rights claimed by the intervenors.[17]

The United States, citing *United States v. Munsey Trust Co. of Wash. D.C.*, 332 U.S. 234, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947), next asserts that laborers and materialmen for whom the intervenors claim subrogation rights, do not have enforceable rights against the United States for compensation.

As to plaintiff, the government asserts that plaintiff's claim to judgment proceeds is not superior to the United States' right of setoff for ERI's unpaid federal tax liabilities. The government argues that federal law determines the relative priority of a federal tax lien. Pursuant to 26 USC § 6323(b)(8), attorneys' liens enjoy a superpriority to the extent that the attorney's efforts creating the fund of settlement or judgment, would be recognized by local law, and the amount of the lien reflects the extent to which the attorney's efforts reasonably contributed to the award.

Although the government does not dispute that plaintiff's efforts created the judgment fund, it argues that the plaintiff has not shown it has perfected its lien under Idaho law. Citing *Frazee v. Frazee*, 104 Idaho 463, 660 P.2d 928 (1983), the government argues that as interpreted by Idaho courts and the Bankruptcy court, an attorney must perfect his or her lien by taking affirmative steps to reduce the lien to a judgment or order of the court.

The United States argues that plaintiff has not shown it has perfected its lien and as a matter of law, even if it could show it perfected, plaintiff cannot enjoy priority over the government's right of setoff under 26 U.S.C. § 6323(b)(8). This statute reads:

**Validity and priority against certain persons**

(b) Protection for certain interests even though notice filed.—Even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid—

---

**17.** Intervenors have, during the interim, filed the Supplemental Affidavit of Ferguson which contains itemization of claims and expense payments made on the bonds subject of this litigation. However, the actual filing with the court did not occur until after or on the same day the pre-hearing reply briefs for the cross motions were filed. Ct. Rec. 46, filed on November 24, 2004.

(8) Attorneys' liens.—With respect to a judgment or other amount in settlement of a claim or of a cause of action, as against an attorney who, under local law, holds a lien upon or a contract enforceable against such judgment or amount, to the extent of his reasonable compensation for obtaining such judgment or procuring such settlement, **except that this paragraph shall not apply to any judgment or amount in settlement of a claim or of a cause of action against the United States to the extent that the United States offsets such judgment or amount against any liability of the taxpayer to the United States.** [emphasis added]

The government argues that the judgment here at issue is against the United States and it intends to offset such judgment against ERI's federal tax liability, therefore, plaintiff cannot under any set of circumstances enjoy priority over the United States' claim of setoff. The government states the policy behind this rather harsh result is protection of the fisc.

Next, the government points out that the $450,000 judgment entered in favor of ERI indicated that the total amount was "inclusive of interest, costs, expenses, and attorney fees" meaning that no specific amount was entered for attorney's fees, and the judgment check could be made out only in the name of ERI. As such, the government argues, it owed this judgment to ERI and no none else, and it has the right to offset ERI's unpaid federal tax liabilities against the amount it owes to ERI pursuant to the judgment. Thus, plaintiff's claims regarding mutuality of debts must fail. Even if such mutuality were lacking, the government states it has no effect on the government's right of setoff.

In its post-hearing briefing and presumably based on the conclusion of its civil action to reduce ERI's tax assessments to judgment on November 24, 2004, the government's argument shifted, in part, from common law right of setoff to that of a statutory setoff pursuant to 31 U.S.C. § 3728. The United States argues that 31 U.S.C. § 3728(a), (b), and (c) enable it to deduct ERI's tax liability from the Claims Court judgment.

Under 31 U.S.C. § 3728, "The Secretary of the Treasury shall withhold paying that part of a judgment against the United States ... that is equal to a debt the plaintiff owes the Government." If the judgment creditor denies the debt or does not agree to the setoff, the Secretary of the Treasury is required to "withhold payment of an additional amount [to] cover legal costs of bringing a civil action for the debt." 31 U.S.C. § 3728(b)(2)(A). If the government loses such a civil action, the Secretary of the Treasury must pay the judgment creditor the balance of the judgment plus interest of 6 percent for the time the money is withheld. 31 U.S.C. § 3728(c).

The government asserts that although its right of setoff exists absent statutory authority, Congress has specifically provided by statute that the government *must* set off any judgment it owes against debts owed to it by its judgment creditor. The government argues that there is no question that the assessments made against ERI, having been reduced to judgment, classify as "debts" owed to the government within the meaning of 31 U.S.C. § 3728. Citing various non-Ninth Circuit case law, the government concludes there is no basis in law for the court to deny its setoff right under 31 U.S.C. § 3728.

Finally, the government reiterates that the plaintiff did not have a perfected, choate lien under Idaho state law at the time the federal tax liens arose because the amount of the attorney's lien could not

be established until the judgment was entered in the Claim Court litigation on April 15[sic], 2004. As to intervenors, the government also argues in its post-hearing brief that intervenors' interest in the judgment fund was not choate until April 15[sic], 2004.

The government, at the close of briefing, requests the court to deny the pending motions and dismiss this case.

## III. STANDARDS OF LAW

### A. Jurisdiction

Only the United States (IRS) argues that this court lacks jurisdiction to provide relief sought by intervenors in excess of $10,000. The IRS argues that the Federal Court of Claims has exclusive jurisdiction over claims against the government exceeding $10,000, regardless of whether the claimant is seeking declaratory judgment. IRS requests that intervenors' claims be dismissed based on the contract between the government (FHWA) and ERI with respect to the Warren Profile Gap Road Project.

Intervenors respond that they have not filed a claim against the government, nor are they asserting in this action that they have been damaged by any act of the government under a theory of contract or tort. Instead, intervenors are seeking a declaratory judgment establishing their priority rights and claim to the Judgment Fund, which is being held by the Treasury Department, a federal agency. Finally, intervenors conclude that their claims are not barred by sovereign immunity and the Tucker Act is inapplicable to the intervenors' claim as sureties.

The court necessarily must deal with jurisdiction at this juncture. The United States' initial position in this litigation was to assert "superior" liens for ERI's unpaid taxes to the other parties' liens. The gov-

ernment also argued a common law right to setoff as a counterclaim to plaintiff's complaint. Then, the government shifted the focus of its position to reliance on a federal statutory right of setoff under the Federal Offset Statute, 31 U.S.C. § 3728 to setoff ERI's federal tax liabilities.

Under 28 U.S.C. § 1346, district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, for any civil action against the United States for the recovery of any internal-revenue tax alleged to have been illegally collected. In the present case, plaintiff, although not the taxpayer, has alleged that the government has illegally withheld the judgment fund based on a setoff for ERI's federal tax liabilities. Section § 1346 reads:

§ 1346 United States as defendant

(a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

(1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws;

. . . . .

■■■ As a general rule, the priority of competing liens against a taxpayer's property, including tax liens, is governed by federal law. *See Aquilino v. United States,* 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960). Specifically, federal common law and the Federal Tax Lien Act of 1966, 26 U.S.C. §§ 6321–6326 (1976) govern the resolution of priorities among competing claims. *See Rice Investment Co. v. United States,* 625 F.2d 565 (5th Cir.1980). When

priority of a federal tax lien is asserted against a state-created lien, state law determines the existence and characteristics of the state lien, but federal law sets the standards for priority.[18]

■ Federal law determines whether the status of "judgment lien creditor" within the meaning of § 6323(a)of the Internal Revenue Code was attained before the Notice of Tax Lien was filed. *In re Dulaney,* 29 B.R. 79, 81 (1982) (citations omitted).

■ The question of the priority of the government's common law setoff rights is a question of federal common law. "The right of set-off is within the equitable power of a court to offset mutual debts running between two parties." *Capuano v. U.S.,* 955 F.2d 1427, 1430 (11 th Cir.1992).

■ In conclusion, the court is satisfied that jurisdiction is proper in this district court[19] pursuant to 28 U.S.C. § 1346 for this civil action against the United States for a sum alleged to have been wrongfully collected under the internal-revenue laws. Here plaintiff alleges that the United States' setoff of $450,000 for ERI's tax liabilities would be a violation of due process and unjust enrichment. This statute, 28 U.S.C. § 1346, does not say that only the person against whom the tax is assessed may sue, but instead, uses broad language such as "any civil action against the United States;" "any sum alleged to have been excessive;" and "in any manner wrongfully collected."

## B. Legal Standards For Summary and Declaratory Judgment

Summary judgement applies to actions for declaratory judgment and is appropriate where "the pleadings . . . together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment may be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party properly supports its motion for summary judgment, the non-moving party must establish a genuine issue of material fact in order to preclude a grant of summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202. In addition, "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548, 91 L.Ed.2d 265.

---

18. It would be contrary to the federal policy of uniformity in the federal tax laws to permit the priority of federal tax liens to be determined by the diverse rules of various states. *In re Dulaney,* 29 B.R. 79, 81 (1982) (citations omitted).

19. Although not raised by the parties, the United States District Court for Idaho would also appear to have continuing jurisdiction to

protect and enforce its judgments. *Central of Georgia R.R. Co. v. United States,* 410 F.Supp. 354, 357 (D.D.C.), *aff'd,* 429 U.S. 968, 97 S.Ct. 474, 50 L.Ed.2d 578 (1976); *accord Sheldon v. Munford, Inc.,* 128 F.R.D. 663, 665 (N.D.Ind.1989) (the district court retains jurisdiction over any issues relating to the enforcement of the judgment).

### C. Government's Right of Setoff

Setoff differs from a lien, inasmuch as the former belongs exclusively to the remedy, and is merely a right to insist, if the party thinks proper to do so, when sued by his creditor, on a counter demand, which can only be enforced through the medium of judicial proceedings; whilst the latter is, in effect, a substitute for a suit. 1834, 2 Op.Atty.Gen. 663. See BLACK'S LAW DICTIONARY 1372 (6th ed.1990) (defining "setoff" as a "claim filed by a defendant against the plaintiff when sued and in which he seeks to cancel the amount due from him or to recover an amount in excess of the plaintiff's claim against him.").

██ The government has both a common law and a statutory right of setoff. The government's common law right of setoff—which is inherent in the federal government—is broad [20] and "exists independent of any statutory grant of authority to the executive branch." *United States v. Tafoya*, 803 F.2d 140, 141 (5th Cir.1986). "The government has the same right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." *United States v. Munsey Trust Co. of Washington, D.C.*, 332 U.S. 234, 239, 108 Ct.Cl. 765, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947) (internal quotations omitted). This right of setoff belongs to every creditor, including the United States, through common law, *United States v. Munsey Trust Co.*, 332 U.S. 234, 239, 108 Ct.Cl. 765, 67 S.Ct. 1599, 1601–02, 91 L.Ed. 2022 (1947), and additionally to the United States by statute. 31 U.S.C. § 3728.

The government's statutory right of setoff [21], the Federal Offset Statute, 31 U.S.C. § 3728 (1994 & Supp. II 1996) [22], provides:

(a) The Comptroller General shall withhold paying that part of a judgment against the United States Government presented to the Comptroller General that is equal to a debt the plaintiff owes the Government.

(b) The Comptroller General shall—

(1) discharge the debt if the plaintiff agrees to the setoff and discharges a part of the judgment equal to the debt; or

(2)(A) withhold payment of an additional amount the Comptroller General decides will cover legal costs of bringing a civil action for the debt if the plaintiff denies the debt or does not agree to the setoff; and

(B) have a civil action brought if one has not already been brought.

(c) If the Government loses a civil action to recover a debt or recovers less than the amount the Comptroller General withholds under this section, the Comptroller General shall pay the plaintiff the balance and interest of 6 percent for the time the money is withheld.

---

20. The Comptroller General has given limited effect to the government's broad common law rights of offset and has, for instance, refrained from offsetting "the current salary payments to officers and employees still in the Federal service." 26 Comp.Gen. 907, 908.

21. See 24 C.F.R. § 17.116 Procedures for administrative offset: offset of debtor's judgment against the United States. Collection by offset against a judgment obtained by a debtor against the United States will be accomplished in accordance with 31 U.S.C. 3728.

22. The Federal Offset Statute has been revised twice since its original enactment to reflect Congress' transfer of authority over the payment of claims from the Secretary of the Treasury to the Comptroller General, see Budget and Accounting Act, 42 Stat. 20 (1921), 31 U.S.C. § 71 (1964) and Act of March 3, 1933, ch. 212, § 13, 47 Stat. 1516, 31 U.S.C. § 227 (1964), and then, back to the Secretary of the Treasury, see Pub.L. No. 104–53, § 211, 31 U.S.C. § 501 note (Supp. II 1996) and 31 U.S.C. § 3728 (Supp. II 1996).

This statute provides that when a plaintiff obtains a judgment against the United States, but owes a debt to the government as well, and does not agree to the setoff, the Comptroller General must perform a setoff, withholding payment of a portion of the plaintiff's judgment and discharging an equal amount of his liability. In addition to the Comptroller General's authority under 31 U.S.C. § 3728, the head of any executive or legislative agency may perform an "administrative offset" of like effect. 31 U.S.C. §§ 3701(a)(1), 3716. These statutes, though, have not displaced the United States' common-law right of setoff. *See Cecile Industries, Inc. v. Cheney,* 995 F.2d 1052 (Fed.Cir.1993).

■ Like other creditors, the United States may assert right of setoff against parties who are claiming rights derivatively from other parties against whom the setoff would be proper. *U.S. v. Cohen,* 389 F.2d 689 (5th Cir.1967). In *Cohen,* the Fifth Circuit held that the right of a federal prisoner's attorneys to recover fees, awarded by federal district court out of tort recovery based on a fellow inmate's assault on a prisoner, was derivative of prisoner's right in the recovery and, hence, subject to government's right to setoff against the prisoner's prior tax assessments, which had been reduced to judgments against the prisoner. In *Transocean Air Lines,* the fees were awarded under a contingency fee contract that provided that the attorneys would receive a one-third interest in the recovery. *United States v. Transocean Air Lines,* 386 F.2d 79, 80 (5th Cir.), *cert. denied,* 389 U.S. 1047, 88 S.Ct. 784, 19 L.Ed.2d 839 (1968). Because the attorneys' interest in the fees was derivative of the plaintiffs' interest in the judgment, the court allowed the government to setoff its claim against the judgement, including attorneys' fees awarded to the plaintiffs. *Id.* at 82.

■ The government's [statutory] right of setoff, although also purportedly broad, is not unlimited. *Marre v. U.S.,* 117 F.3d 297, 303 (5th Cir.1997). Section 3728 expressly applies only to offsets against any "judgment" owed by the United States. Further, in order for the government to invoke its right of setoff, there must be mutuality of debt between the parties. *See United States v. 717.42 Acres of Land,* 955 F.2d 376, 381 (5th Cir.1992) (reasoning that a mutuality of debt must exist before the United States can set off). Mutuality requires that the judgment creditor be the same person (in the view of the law) as the party who owes the debt to be collected, and the government must be the same person to whom the debt is owed. *See Doe v. United States,* 58 F.3d 494, 498 (9th Cir.1995) ("all agencies of the United States, except those acting in some distinctive private capacity, are a single governmental unit" for setoff against the United States).

Another limitation on the government's statutory right of setoff is known as the equitable subordination doctrine. This doctrine is rooted from the bankruptcy court's inherent equitable powers, *Pepper v. Litton,* 308 U.S. 295, 303–11, 60 S.Ct. 238, 84 L.Ed. 281 (1939), a power also shared by admiralty courts (see e.g., *Cantieri Navali Riuniti v. M/V SKYPTRON,* 621 F.Supp. 171, 187 (W.D.La.1985), *aff'd and remanded,* 802 F.2d 160 (5th Cir. 1986)); *Hornbeck Offshore Operators, Inc. v. Ocean Line,* 849 F.Supp. 434 (E.D.Va. 1994).

■ Under this doctrine, a court can subordinate the government's right of setoff in certain situations. Three conditions are necessary to justify equitable subordination: (I) The setoff claimant must have engaged in some type of inequitable conduct, such as fraud, illegality, or breach of fiduciary duty; (ii) the misconduct must

have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim must not be inconsistent with federal statutes. *See Custom Fuel Services v. Lombas Industries*, 805 F.2d 561, 566 (5th Cir.1986) (citations omitted).

A procedural limitation under § 3728(a) requires the government to bring suit in district court on its offsetting claim if it seeks an offset and the judgment creditor denies the debt or does not agree to the setoff.

### D. Priority Statute

Where several liens have attached to one fund, the lien that is "first in time" will generally have priority, that is, it must be satisfied before recovery may occur under subsequent liens. *Montavon v. U.S.*, 864 F.Supp. 519, 520 n. 1 (E.D.Va.1994). There are exceptions to this general rule as well as a number of rules which govern the determination of when a federal tax lien arises and when a state-created lien arises for purposes of the general rule. *Rice Investment, Co. v. U.S.*, 625 F.2d 565, 568–69 (5th Cir.1980).

Under the federal common law of choateness, a state-created lien is deemed to be in existence for "first in time" purposes when it is "perfected" or "choate"; that is, when the " 'identity of the lienor, the property subject to the lien, and the amount of the lien are established.' " *U.S. By and Through I.R.S. v. McDermott*, 507 U.S. 447, 449, 113 S.Ct. 1526, 123 L.Ed.2d 128 (citations omitted); *see also United States v. Central Bank*, 843 F.2d 1300, 1307 (10th Cir.1988). Choate liens take priority over later filed federal tax liens, while inchoate liens do not. *Horton Dairy, Inc. v. United States*, 986 F.2d 286, 291 (8th Cir.1993) (citations omitted). While the choateness doctrine is irrelevant when 26 U.S.C. § 6323 accords a lien priority over a federal tax lien, the doctrine of choateness nevertheless still applies when § 6323 is silent regarding priority. *See, e.g. Burrus v. Oklahoma Tax Commission*, 59 F.3d 147 (10th Cir. 1995) (giving state tax lien priority under choateness doctrine).

Treasury Regs. § 301.6323(h)–1(g) provides the following definition of a judgment lien creditor:

The term 'judgment lien creditor' means a person who has obtained a valid judgment, in a court of record and of competent jurisdiction, for a recovery of specifically designated property or for a certain sum of money. In the case of a judgment for the recovery of a certain sum of money, a judgment lien creditor is a person who has perfected a lien under the property involved. A judgment is not perfected until the identity of the lienor, the property subject to the lien, and the amount of the lien are established....

This definition is in accordance with the Supreme Court's decision in the *United States v. City of New Britain*, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954). For the first time, the court in *New Britain* deemed a state-created lien choate and, therefore, worthy of priority over subsequent federal tax liens on the basis of the "first in time" principle. *New Britain*, 347 U.S. at 84–5, 74 S.Ct. 367. *New Britain* announced the seminal test for determining priority of state-created liens: A state-created lien takes priority over a later federal tax lien when "there is nothing more to be done to have a choate lien-when the identity of the lienor, the property subject to the lien, and the amount of the lien are established." *New Britain*, 347 U.S. at 84, 74 S.Ct. 367. The *New Britain* court provided justification for ap-

plying the choateness [23] doctrine to protect federal liens. The court hypothesized that "[o]therwise, a State could affect the standing of federal liens, contrary to the established doctrine, simply by causing an inchoate lien to attach at some arbitrary time even before the amount of tax, assessment, etc. is determined". *Id.* at 86, 74 S.Ct. 367.

In other words, the various fictions by which a lien, when ultimately perfected, "relates back" under state law to a time when some preliminary step was taken to create or enforce the lien, are not applicable in determining whether a lien was perfected or choate at the time a federal tax lien arose.

Recognizing that the confusing new judicial concept of choateness was undermining the financing methods fostered by the Uniform Commercial Code, Congress enacted the Federal Tax Lien Act of 1966 [FTLA], which was incorporated into the Internal Revenue Code as sections 6321 through 6323 and has since remained largely unchanged. 26 U.S.C. §§ 6321, 6322, 6323 (1988 & Supp. IV 1992). A major goal behind the FTLA was to conform federal law to the commercial transactions governed by the U.C.C.[24] The FTLA expanded the superpriority provisions now codified in section 6323(b)[25] and provided, among other things, specific pro-

tection for attorney's liens, and certain commercial transactions financing agreements. *Id.* The FTLA also codified the "first in time" principle and reaffirmed the notice-filing provisions and the choateness doctrine as it applied to judgment creditors. *Id.*

### E. Superpriority–Attorney's Lien

Under 26 U.S.C. § 6323(b), certain liens enjoy "superpriority" over federal tax liens, meaning they must be satisfied first, regardless of the "first in time" principle. *Air Power, Inc. v. United States*, 741 F.2d 53, 55 n. 1 (4th Cir.1984).

Section 6323(b)(8) provides that if an attorney has a lien or a contract enforceable under local law against the proceeds or settlement of a claim, and the lien is for reasonable compensation in connection with securing the judgment or the settlement of a claim or cause of action, that lien takes priority over the federal tax lien. IRC § 6323(b)(8); Reg. § 301.6323(b)–1(h). See *U.S. v. State Nat. Bank of CT*, 421 F.2d 519 (2nd Cir.1970). Knowledge by the attorney of the tax lien does not disqualify the attorney from asserting superpriority status. Reg. § 301.6323(b)–1(h)(3).

Without such a provision, the federal tax lien would cover all of the taxpayer's property, including causes of action and any

---

**23.** The requirement of choateness should not be confused with the concept of perfection. While perfection usually requires that a private creditor's lien be filed with an appropriate state authority in order for it to have priority over another private creditor's lien, choateness usually requires something more- it requires that there be no contingencies standing in the way of execution of the lien. *See Security U.S. v. Security Trust & Sav. Bank of San Diego*, 340 U.S. 47, 50, 71 S.Ct. 111, 95 L.Ed. 53 (1950). In *Security Trust*, an attachment lien, even though filed, was contingent upon the outcome of an underlying suit. *Id.*

**24.** When First In Time Is Not First In Right: The Supreme Court Frustrates Judgment Creditors in *United States v. McDermott, Loyola Univ. of Chicago Law Journal,* 25 Loy. U. Chi.L.J. 405,420 (1984). By Michael D. McCullogh.

**25.** Superpriority-the priority granted to state interests over all federal liens-was extended under the FTLA to eight new areas of interests including attorney's liens and certain insurance contracts. Section 6323(b).

amounts which may be owed to an attorney for work in connection with securing judgments or settlement of suits or other proceedings. S.Rep. No. 1708, 89th Cong.,2d Sess. 6. This provision protects the attorney to the extent of a reasonable fee, as long as it is protected by local law, for efforts in obtaining and collecting the judgment or amount. *See U.S. v. Stonehill,* 702 F.2d 1288 (9 th Cir.1983), cert. denied 471 U.S. 1066, 105 S.Ct. 2142, 85 L.Ed.2d 499 (1985); *Spielvogel v. Harkins & Maeger Ltd.,* 639 F.Supp. 1397 (S.D.N.Y.1986).

Reasonable compensation is defined as the amount customarily allowed under local law for such attorney's services for litigating or settling a similar case or administrative claim. § 301.6323(b)–1(h). This is determined by the circumstances in each case. It may be established by multiplying the attorney's reasonable hourly rate by the number of hours reasonably expended on the legal activity. In appropriate cases, the courts may adjust the lodestar figure according to the twelve (12) factors identified in the *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir. 1975), *cert. denied* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976) case.

When a judgment or settlement is in respect to a claim against the United States, the United States has the right to offset any liability of the taxpayer to the United States against the judgment or settlement. The attorneys' lien superpriority, therefore, does not apply with respect to judgments obtained for the taxpayer against the government. Internal Revenue Code § 6323(b)(8); Reg. § 301.6323(b)–1(h); *Montavon v. U.S.,* 864 F.Supp. 519 (E.D.Va.1994). Section 6323(b)(8) reads:

(8) Attorneys' liens.—With respect to a judgment or other amount in settlement of a claim or of a cause of action, as against an attorney who, under local law, holds a lien upon or a contract enforceable against such judgment or amount, to the extent of his reasonable compensation for obtaining such judgment or procuring such settlement, **except that this paragraph shall not apply to any judgment or amount in settlement of a claim or of a cause of action against the United States to the extent that the United States offsets such judgment or amount against any liability of the taxpayer to the United States.** [Emphasis added].

The House Report explains that an attorney will not enjoy superpriority "to the extent that the United States, under any legal or equitable right, offsets its liability under the judgment or settlement against any liability of the taxpayer to the United States." H.R.Rep. No. 1884, 89th Cong., 2d Sess. at 39 (1966) (emphasis added). The report then offers two examples of means by which the government might offset a judgment, one from common law, and the other from statute, indicating that the examples are not meant to be exhaustive. *Id.* Debate on the House floor also indicated that the offset exception contained no technical restriction as to how the government applies the judgment against the debt. The bill's chief proponent explained that "[t]he right of offset would exist between two private parties each having claims against the other. We saw no reason for treating the Government worse in this situation, than we would a private party having a claim against the person involved." 112 Cong.Rec. 22,226 (1966) (statement of Rep. Mills).

The House and Senate reports each summarize the effect of the offset exception as follows:

However, under the bill, in a proceeding against the Government, the Government retains its right to set off against

any recoveries from it any amounts due it by the taxpayer on account of any tax or any other debt or claim. This setoff means that the attorney's lien "superpriority" does not apply with respect to judgments he obtains for the taxpayer against the Government (citations omitted). The passage suggests that the key fact is whether the judgment obtained runs against the government.

*Montavon v. United States,* 864 F.Supp. 519, 526 n. 18 (E.D.Va.1994).

■ Where there is a judgment against the United States, but the notice of federal tax lien has not been filed, neither the basic purpose of Section 6323(b)(8) nor the claim against the United States exception is invoked, and the general rule of "first in time, first in right" applies. *Capuano,* 955 F.2d at 1433.

In *Capuano,* the government conceded that attorney *Capuano* had a charging lien under Florida law and that the attorney's charging lien for $25,000 of the $100,000 settlement amount was choate as of June 9, 1988, the day the final judgment was entered. Id. at 1433. The government further conceded that because the IRS, having made its tax assessment on July 7, 1998, almost one month *after* the final judgment was entered, Capuano's charging lien was clearly first in time and first in right over the federal tax lien. *Id.* Although Capuano's lien was in fact based on a judgment against the United States, it was choate under local law before the federal tax lien was filed. *Id.* Hence, § 6323(b) did not come into play and the general rule of "first in time, first in right" applied.

**26.** The parties do not dispute that Idaho law is the state law (local law) to be applied *in*

## Attorney's Lien Under Local Law–Idaho

The statute that authorizes an attorney's charging lien under Idaho law[26] is I.C. § 3–205, which provides:

The measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties, which is not restrained by law. From the commencement of an action, or the service of an answer containing a counterclaim, the attorney who appears for a party has a lien upon his client's cause of action or counterclaim, which attaches to a verdict, report, decision or judgment in his client's favor and the proceeds thereof in whosoever hands they may come; and can not be affected by any settlement between the parties before or after judgment.

*Kenneth F. White, Chtd. v. St. Alphonsus Regional,* 136 Idaho 238, 241, 31 P.3d 926 (Idaho App.2001).

■ Under Idaho law, an attorney is not required to institute an independent action to file an attorney's lien, but can file a notice and a motion to foreclose on that lien in connection with the principal case. *Frazee v. Frazee,* 104 Idaho 463, 464, 660 P.2d 928, 929 (1983). An attorney can seek to enforce an attorney's lien for payment for services rendered by "petition" in the underlying case. *Skelton v. Spencer,* 102 Idaho 69, 73, 625 P.2d 1072, 1076 (1981). Moreover, I.R.C.P. 7(b) requires that an application to the court for an order be made by motion. *Dragotoiu v. Dragotoiu,* 133 Idaho 644, 991 P.2d 369 (1998).

■ Further, to enforce an attorney's lien under Idaho case law, it is clear that counsel seeking to enforce an attorney's lien must, in an adjudicative process, show

this case.

the reasonableness of the fees. *Cole v. Kunzler,* 115 Idaho 552, 768 P.2d 815 (1989).

■ An attorney's right to compensation pursuant to a contingency fee agreement is a property right determined under applicable state law. Under Idaho law, the reasonableness of a contingency fee agreement is based on a balancing of the risk factor with the potential for overreaching. *Clark v. Sage,* 102 Idaho 261, 265, 629 P.2d 657, 661 (1981) (setting forth additional factors to consider in determining the reasonableness).

An attorney's right to compensation pursuant to a contingency fee agreement is a property right determined under applicable state law. *Barnhill v. Johnson,* 503 U.S. 393, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992); *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).

■ It is also generally accepted that an attorney does not receive a legal or equitable interest pursuant to a contingency fee contract until the contingency actually occurs, i.e. a finalized judgment or settlement. *Missouri Pac. R.R. Co. v. Austin,* 292 F.2d 415, 419 (5th Cir.1961).

### F. Surety's Equitable Subrogation Rights

■ In general terms, subrogation is the substitution of one party in place of another with reference to a lawful claim, demand or right. It is a derivative right, acquired by satisfaction of the loss or claim that a third party has against another. Subrogation places the party paying the loss or claim (the "subrogee") in the shoes of the person who suffered the loss ("the subrogor"). Thus, when the doctrine of subrogation applies, the subrogee succeeds to the legal rights and claims of the subrogor with respect to the loss or claim. *See,*

*e.g., Amer. Surety Co. of New York v. Bethlehem Nat. Bank,* 314 U.S. 314, 317, 62 S.Ct. 226, 86 L.Ed. 241 (1941) (discussing equitable doctrine of subrogation in surety context); *Han v. United States,* 944 F.2d 526, 529 (9th Cir.1991) (discussing equitable subrogation generally).

In the construction industry, there are generally two types of surety bonds: the performance bond and the payment bond. Under a performance bond, the surety guarantees the obligee (the party to whom the surety owes the duty of performing its obligations under the bond) that in the event of a principal's default, the contract will be completed for the original contract price. *See, United States v. Munsey Trust Co.,* 332 U.S. 234, 244, 108 Ct.Cl. 765, 67 S.Ct. 1599, 1604, 91 L.Ed. 2022 (1947).

The performance bond generally gives the surety the option of completing performance of the contract or of assuming liability for the cost of completing the contract in excess of the contract price. *See, Morgenthau v. Fidelity & Deposit Co.,* 94 F.2d 632, 635 (D.C.Cir.1937) ("No difference between completion of the work by the surety . . . and the furnishing of money to the contractor after his default . . . to enable him to perform the contract").

On the other hand, a payment bond (also known as a "labor and material bond") issued by a surety guarantees that subcontractors, laborers and material suppliers will be paid in the event of the principal's default. *See, Morrison Assurance Co., Inc. v. United States,* 3 Cl.Ct. 626 (1983).

Underlying these two bonds is the premise that "[i]f the contractor defaults, the surety performs the work, mitigates loss by its performance, and pays the subcontractors and suppliers." *First Indemnity of America v. Modular Structures, Inc (In re Modular Structures, Inc.),* 27 F.3d 72, 74 n. 1 (3rd Cir.1994).

■ It has long been held that where a surety, which issued payment and/or performance bonds, satisfies the obligation of its principal, it is subrogated to the rights of the obligee, the principal or the third party beneficiary. *See, Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 136–137, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962).

The surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of the laborers and materialmen who have been paid by the surety—who may have had liens; and not least, in the shoes of the government [owner] for whom the job was completed. *National Shawmut Bank v. New Amsterdam Casualty Co.*, 411 F.2d 843, 845 (1st Cir., 1969).

Claims of a surety, by way of subrogation, do have limits however. See *Munsey Trust*, 332 U.S. 234, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (recognizing that the government's right to a setoff based on sums due from the contractor on other jobs is superior to any claim of the surety by way of subrogation); *Active Fire Sprinkler v. United States*, 811 F.2d 747, 756 (2d Cir.1987) (recognizing that claims based on subrogation do not trump those of unpaid subcontractors).

■ The rights of subrogation apply equally when the surety is called upon to pay a labor or material claim as when the surety is required to complete the performance of the contract. *See, Pearlman*, and *Fireman's Fund Insurance Co. v. United States*, 421 F.2d 706, 190 Ct.Cl. 804 (Ct.Cl., 1970). Under the payment bond scheme, if the surety pays labor and/or material claims, it is subrogated to the rights of the laborer and/or supplier and the contractor to the corresponding contract funds. *See, National Surety Corp. v. United States*, 132 Ct.Cl. 724, 133 F.Supp. 381, 383–384 (1955), *cert denied, sub. nom., First National Bank v. United States*, 350 U.S. 902, 76 S.Ct. 181, 100 L.Ed. 793 (1955). In the instant case, the intervenors do not request subrogation to contract funds but to a settlement fund stemming from the settlement of claims between ERI and the governmental agency FHWA.

■ Equitable subrogation is a state law doctrine and therefore whether equitable subrogation applies in this case presents a question of Idaho law. In Idaho, the doctrine of subrogation is not administered as a legal right but the principle is applied to subserve the ends of justice and to do equity. *Hoopes v. Hoopes*, 124 Idaho 518, 520, 861 P.2d 88, 90 (1993). It does not rest on contract and no general rule can be laid down which will afford a test in all cases for its application, and whether the doctrine is applicable to any particular case depends upon the peculiar facts and circumstances of such case. *Houghtelin v. Diehl*, 47 Idaho 636, 639–40, 277 P. 699, 700 (1929).

■ Under Idaho law, one who claims to be equitably subrogated to the rights of a creditor must satisfy certain prerequisites: (1) payment must be made pursuant to an obligation to do so, or in order to protect the subrogee's own interest, i.e., the subrogee must not be making the payment as a mere "volunteer." *Williams v. Johnston*, 92 Idaho 292, 298, 442 P.2d 178, 184 (1968); (2) the debt paid must be one for which the subrogee was not primarily liable; and (3) the entire debt must be paid. *Houghtelin*, 47 Idaho at 640, 277 P. at 700, (1929); *Cozzetto v. Wisman*, 120 Idaho 721, 726, 819 P.2d 575, 576, (Ct.App. 1991). Finally, (4) the subrogation must not work any injustice to the rights of

others. *Houghtelin,* supra. *See generally, Caito v. United California Bank,* 20 Cal.3d 694, 144 Cal.Rptr. 751, 576 P.2d 466 (1978).

█ Because the surety's rights are based in equity, not contract, it is important to note that the surety need not file a U.C.C. financing statement to perfect its equitable claim. See, *Amwest Surety Insurance Company v. United States,* 870 F.Supp. 432 (D.Conn., 1994). *See also, In re Alliance Properties, Inc.,* 104 B.R. 306, 311 (Bkrtcy.S.D.Cal.1989) (surety "not required to file a financing statement to perfect [its equitable subrogation] lien since it exists as a matter of equity rather than by contract.").

█ It is clear that in the context of undisbursed construction funds, the surety's equitable lien attaches to those proceeds which remain undisbursed as of the time of the contractor's default. However, it is not necessary that there be a formal declaration of the contractor's default. See *Fidelity & Deposit Co. v. United States,* 393 F.2d 834, 837, 183 Ct.Cl. 908 (Ct.Cl., 1968).

█ A surety on the performance and payment bonds of a contractor, who performs the contract on the default of the contractor, acquires an equitable lien upon any sum remaining in the hands of the one for whose protection the bond was given, and the lien is choate and perfected where the surety has fully performed, even though the beneficiary of the bond has not ascertained the balance due the surety. *American Fidelity Co. v. Delaney,* 114 F.Supp. 702 (D.C.Vt.1953).

**Relation Back Doctrine**

█ Courts have adopted the rule that a federal tax lien will have priority to contract proceeds over a surety only if the lien is filed before the execution of the surety bond. In *United States v. Trigg,* 465 F.2d 1264, 1270 (8th Cir., 1972) *cert. den.,* 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973), the Eighth Circuit held that if the surety bond is issued before the federal tax lien is filed and the surety incurs losses by reason of the bonds, the surety has priority to contract proceeds remaining on the bonded contracts over the I.R.S. under its tax lien.

This doctrine of "relation back" (i.e., referring back to the date of the execution of the surety bond) has been upheld by numerous courts. See e.g., *National Surety Corp.* and *Fireman's Fund Insurance Co., supra.* In *Fireman's Fund Insurance Co.,* the court noted that the surety's equitable subrogation right is only a potential right which becomes an actuality when the surety satisfies the debt of its principal. "However, the surety's rights of subrogation relate back to the date of the execution of the surety bonds ..." *Fireman's Fund Insurance Co.,* 421 F.2d at 708.

## IV. ANALYSIS

The court will resolve the priority of rights of setoff, or the merit of the United States' claim for setoff first, for if the setoff proves successful in the full amount ($450,000), any recovery by ERI will be destroyed and there will be nothing to which the plaintiff's and intervenors' liens could attach. It was the initiation of the setoff process on May 5, 2004, when the Comptroller General withheld paying that part of a judgment against the United States equal to a purported debt ERI (the judgment creditor) purportedly owed the government, that set into motion this contest of liens.

The government possesses the same self-help right of recovery through setoff as any other creditor. *See United States v. Munsey Trust Co.,* 332 U.S. 234, 239, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed.

2022 (1947); *Hilburn v. Butz,* 463 F.2d 1207 (5th Cir.1972), *cert. denied,* 410 U.S. 942, 93 S.Ct. 1359, 35 L.Ed.2d 608 (1973); *Burlington Northern Inc. v. United States,* 199 Ct.Cl. 143, 462 F.2d 526 (1972); *Aetna Ins. Co. v. United States,* 197 Ct.Cl. 713, 456 F.2d 773 (1972); *United States v. Cohen,* 389 F.2d 689 (5th Cir.1967). Thus, the United States can assert a right of setoff independent of a statutory grant of authority. *See, e.g., United States v. Tafoya,* 803 F.2d 140, 141 (5th Cir.1986).

■ The United States is one party for mutuality purposes and can setoff claims held by different agencies. *See, e.g., Cherry Cotton Mills v. United States,* 327 U.S. 536, 105 Ct.Cl. 824, 66 S.Ct. 729, 90 L.Ed. 835 (1946); *Bosarge v. U.S. Dept. of Education,* 5 F.3d 1414, 1419 (11th Cir.1993), *cert. denied,* 512 U.S. 1226, 114 S.Ct. 2720, 129 L.Ed.2d 845 (1994).

In addition to the government's inherent right to offset, statutes and regulations sometimes provide for offset. *See, e.g.,* 26 U.S.C. § 6402(a) (IRS may setoff taxpayer's overpayment of tax against tax liability for prior years); 31 U.S.C. § 3720A (federal agencies may refer past due debt to Treasury for offset against tax overpayment pursuant to 26 U.S.C. § 6402(d)); 31 U.S.C. § 3716(a) (administrative offset statute); 31 U.S.C. § 3716(c) (Treasury disbursing officer offset statute); 31 U.S.C. § 3728 (United States can setoff judgment against it to recover a debt plaintiff owes to the United States); 7 C.F.R. § 1951.103 (1995) (the Consolidated Farm Services Agency can setoff debts to the United States against ongoing Conservation Reserve Program payments); 13 C.F.R. § 140.5 (1993) (SBA offset); 41 C.F.R. § 101–41.102(a)(3) (GSA can setoff amounts due to the United States from ongoing payments to carriers); Federal Acquisition Regulation, 48 C.F.R. §§ 32.611, 32.612 (1992) (United States can

setoff obligations between itself and parties contracting with the United States). See 4 C.F.R. § 102.3, as to the responsibility of client agencies to effect collection by offset.

A federal statute or regulation, of course, may limit setoff rights of the United States. *See, e.g.,* 31 U.S.C. § 3720A (federal agency referring debt to Treasury for offset must first notify person of plan to refer the debt and give debtor at least 60 days to present evidence that debt is not past due or legally enforceable). *Compare McCall Stock Farms, Inc. v. United States,* 14 F.3d 1562, 1567 (Fed.Cir.1993) ("Debt Collection Act was intended to supplement, not displace, the government's pre-existing offset rights under the common law"); *Bosarge v. United States,* 5 F.3d 1414 (11th Cir.1993) (Federal Debt Collection Procedure Act, 28 U.S.C. § 3001 et seq., expressly exempts common law or statutory right to offset or recoupment, see § 3003(c), from its requirements); *Cecile Indus., Inc. v. Cheney,* 995 F.2d 1052 (Fed.Cir.1993) (offset of claims from different contracts (setoff) not governed by Debt Collection Act, 31 U.S.C. § 3701 et seq.); *Allied Signal, Inc. v. United States,* 941 F.2d 1194 (Fed.Cir.1991) (offset of claims from the same contract (recoupment) is not governed by the DCA); *Cascade Pac. Int'l v. United States,* 773 F.2d 287, 295–96 (Fed.Cir.1985) (any procurement contract subsequent to 1979 containing CDA "all-disputes" clause reserved the common law right to offset money owed by defaulted contractor); *Amoco Prod. Co. v. Fry,* 904 F.Supp. 3 (D.D.C.1995) (DCA merely supplements common law right to offset) with *Allison v. Madigan,* 951 F.2d 869 (8th Cir.1991) (administrative setoff must comply with DCA).

When a claimant obtains a final judgment against the United States and presents it to the Treasury for payment, the

Treasury may withhold such payment to setoff a claim which the United States has against the claimant, and such further amount as will cover the government's legal charges and costs in pursuing the government's claim to judgment if the claimant does not assent to a setoff. See 31 U.S.C. § 3728. The policy of the statute is that claims against the United States are always subject to setoff. *See Ozanic v. United States,* 188 F.2d 228, 231 (2d Cir. 1951).

Generally, courts have only disallowed otherwise valid setoff in two categories of cases: (a) where the creditor committed an inequitable, illegal, or fraudulent act, or the setoff is against public policy, see *In re Cascade Roads, Inc.,* 34 F.3d 756 (9th Cir. 1994) (IRS setoff denied because Government's conduct was inequitable); *In re Blanton,* 105 B.R. 321, 337 (Bankr.E.D.Va. 1989) and cases cited therein, and (b) where the setoff would significantly harm or destroy the debtor's ability to reorganize, *see, e.g., In re Lincoln,* 144 B.R. 498 (Bankr.D.Mont.1992) (setoff denied where payments necessary for chapter 12 reorganization); *In re Cloverleaf Farmer's Co-Op.,* 114 B.R. 1010 (Bankr.D.S.D.1990) (setoff denied because inconsistent with purpose of chapter 12 and the rehabilitation of American farmers); *In re IML Freight,* 65 B.R. 788, 792 (Bankr.D.Utah 1986) (legislative history shows setoff only appropriately denied in reorganization cases; not appropriate in liquidation cases); *In re Penn Cent. Transp.,* 315 F.Supp. 1281 (E.D.Pa.1970) (setoff denied because it would frustrate railroad reorganization process), *aff'd,* 453 F.2d 520 (3d Cir.), *cert. denied,* 408 U.S. 923, 92 S.Ct. 2493, 33 L.Ed.2d 334 (1972).

 In this case, mutuality requirements are met. The requirement that a "judgment" be owed by the United States is met. Under 31 U.S.C. § 3728(a), man-

datory-like language directs that the Comptroller General *shall* withhold paying that part of a judgment against the United States Government presented to the Comptroller General that is equal to a debt the plaintiff owes the Government when the judgment creditor does not consent to the setoff.

Presumably the taxpayer, ERI, did not consent to the setoff in this case and the Comptroller General withheld payment of the judgment pursuant to 31 U.S.C. § 3728 until a judgment was obtained for the tax debt. The government, in its effort to statutorily setoff under § 3728, properly sued ERI through a judicial proceeding in the District Court of Idaho on June 3, 2004, 17 days prior to plaintiff's instant suit, to reduce ERI's tax assessment to judgment. The judgment was entered in favor of the government for $609,079.96 on November 29, 2004.

Nothing in the stipulation between ERI and the United States demonstrates an intent on the part of the United States to waive its right of offset. Moreover, plaintiff has not argued that the United States has waived its rights by entering into the stipulated judgment with ERI.

Pursuant to established case law, the stipulation between ERI and the United States, and the contingency fee agreement between plaintiff and ERI, plaintiff's fee interest was derivative of ERI's recovery in the Court of Claims litigation, and therefore inferior to the government's right of setoff. See *Marre v. U.S.,* 117 F.3d 297 (5th Cir.1997); *Morgan v. United States,* 131 F.Supp. 783 (S.D.N.Y.1955); *Brozan v. United States,* 128 F.Supp. 895 (S.D.N.Y.1954) (cases establishing the government's superior right to setoff).

The plaintiff and intervenors are entitled to recover nothing on the judgment fund, for the government's setoff destroyed any

recovery. Therefore, there is nothing to which the attorneys' lien nor the intervenors' liens could attach.

If the government had not raised statutory setoff, the intervenors likely would have prevailed, as to a portion of the judgment fund, under the federal priority statute. Based on equitable subrogation and the relation back doctrine, Intervenors could recover an amount paid on behalf of ERI[27] for the Warren Project.

▮ Applying its equitable powers under these circumstances, the court could have also considered the award of plaintiff law firm's reasonable fees and costs for work on the Warren project, based on public policy grounds. As under the federal priority statute, plaintiff's attorneys' lien simply was not a choate lien at the time the federal tax liens arose.

More specifically, the amount of the attorneys' lien could not have been established until the judgment was entered in the Court of Claims litigation on April 5, 2004. Under the federal priority statute, plaintiff's lien was not superior to the several tax liens filed on or before March 29, 2004. Under Idaho (local) law, it would appear that plaintiff's lien was shy of being an enforceable lien, having not shown the reasonableness of the fees in an adjudicative process prior to filing this lawsuit or reducing its lien to a judgment or court order. As discussed above, the choateness doctrine must be factored in to decide whether a right of setoff arising based on equitable principles should be accorded priority over a federal tax lien. Plaintiff's lien had not achieved the level of choateness required.

Moreover, without exploration of the purpose or spirit of 26 U.S.C. § 6323(b)(8), it is the court's assessment that the exception contained within § 6323(b)(8) is applicable to the facts of this case. In other words, superpriority does not apply with respect to judgments obtained for the taxpayer against the government and would not appear to save plaintiff's inchoate lien in this case.

In summary, plaintiff's rights are derived through ERI and are not independent of that relationship. The common law and statutory right of setoff enjoyed by the United States and case law does not support plaintiff's claim for payment of attorney fees, either on a lien or quantum meruit basis. Even if the attorneys' lien superpriority provision of federal law were applicable, plaintiff's attorneys' lien is not choate under Idaho law because no final determination and judgment in plaintiff's favor had been entered before the rights of the United States arose.

The court very reluctantly arrives at the conclusion stated herein and readily acknowledges the harshness of the result. Moreover, if the undersigned judge had discretion to apportion the judgment fund at issue using equitable principles, he would not hesitate to do so. However, without solid support in the statutes and case law, plaintiff's and intervenors' claims cannot have priority.

Accordingly,

**IT IS ORDERED** that:

1. Intervenors' Motion for Declaratory Judgment, filed October 19, 2004 (Ct. Rec.20) is **DENIED**.

---

**27.** There is a serious question as to whether intervenors could use the default on one project to trigger its equitable subrogation rights to undisbursed construction funds on other bonded projects. There is also a question whether payments made by intervenors in the amount of $97,876.08 for legal and engineering firm expenses and travel expenses are considered "unconnected" with the performance of the Warren project contract and not recoverable. *Carchia v. U.S.,* 485 F.2d 622, 630, 202 Ct.Cl. 723 (1973).

2. Plaintiff Dunn and Black, P.S.'s Motion for Summary Judgment (Ct.Rec.28), filed November 2, 2004 is **DENIED**.

3. Intervenors' Alternative Motion For Stay of Plaintiff's Motion For Summary Judgment under Fed.R.Civ.P. 56(f) (Ct. Rec.40), filed November 16, 2004 is **MOOT**.

4. Defendant United States' claim of setoff in the amount of $450,000 is appropriate pursuant to 31 U.S.C. § 3728.

The District Court Executive is directed to file this ORDER and provide copies to counsel.